JS-6

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

JAIME CARRANZA, an individual, on
behalf of himself and all others similarly
situated,

             Plaintiff,

       vs.

NORDSTROM, INC., a Washington
corporation, and DOES 1 through 10,
inclusive,

            Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)

CASE NO. EDCV 14-01699 MMM (DTBx)

ORDER GRANTING PLAINTIFF'S
MOTION TO REMAND

     On July 15, 2014, Jaime Carranza filed this putative class action against Nordstrom, Inc.,

("Nordstrom") and various unnamed defendants in San Bernardino Superior Court.[1] Nordstrom

removed the action on August 15, 2014, invoking the court's diversity jurisdiction under the Class

Action Fairness Act ("CAFA") of 2005, 28 U.S.C. § 1332(d)(2).[2] Carranza filed a motion to

---

[1]Declaration of Dominic J. Messiha in Support of Notice of Removal ("Messiha Decl."),
Docket No. 3 (Aug. 15, 2014), Exh. A ("Complaint").

[2]Notice of Removal ("Removal"), Docket No. 1 (Aug. 15, 2014).

remand the action to San Bernardino Superior Court on September 10, 2014,[3] which Nordstrom opposes.[4]

Pursuant to Rule 78 of the Federal Rules of Civil Procedure and Local Rule 7-15, the court finds this matter appropriate for decision without oral argument. The hearing calendared for December 15, 2014, is therefore vacated, and the matter is taken off calendar.

## I. FACTUAL BACKGROUND

### A.   Factual Allegations Concerning All Plaintiffs

Carranza was employed by Nordstrom at its fulfillment center in San Bernardino, California, in March and April 2014.[5] He and the members of the putative class he seeks to represent are current and former non-exempt, hourly employees of Nordstrom who were allegedly subjected to an on-premises security screening each day after they clocked out for meal periods, rest periods, and at the end of a shift.[6] Carranza alleges that Nordstrom hires hourly employees at its fulfillment centers throughout California and requires, as a condition of employment, that the employees submit to daily security searches on the premises to protect property and prevent loss of merchandise through employee theft.[7] Nordstrom employees purportedly cannot refuse to submit to this security search or they will be subject to immediate termination or reprimand.[8]

Carranza asserts that the searches are similar to the security screening performed at airports; Nordstrom employees are purportedly required to remove all personal belongings, such

---

[3]Notice of Motion and Motion to Remand Case to San Bernardino Superior Court ("Motion"), Docket No. 14 (Sept. 10, 2014).

[4]Memorandum in Opposition to Motion to Remand Case to San Bernardino Superior Court ("Opposition"), Docket No. 16 (Nov. 24, 2014).

[5]Complaint, ¶ 6.

[6]*Id.*, ¶¶ 7, 16.

[7]*Id.*, ¶¶ 10, 17.

[8]*Id.*

2

as wallets, keys, and belts, and pass through metal detectors before being allowed to leave the fulfillment centers.[9]  Carranza alleges that due to the security searches, employees left their personal belongings in their vehicles, with the result that they could not engage in personal activities while being screened or waiting to be screened.[10]

Carranza contends that Nordstrom's policy regarding the searches was systematic and continuous, and had a common impact on all Nordstrom employees subject to it, in that they were routinely denied uninterrupted, compliant meal periods and rest periods, and were not compensated for the time they were under Nordstrom's control being screened or waiting to be screened.[11]  He asserts that because of the search policy, employees spent five to fifteen minutes of their meal period each day in screening, with the result that the employee had only a fifteen to twenty-five minute meal period.[12]  Employees who wished to take off-premises rest breaks likewise were subject to search; consequently, they were allegedly not permitted a full ten minute duty-free rest period as required under California law.[13]  Carranza alleges that, at the end of a shift, employees were first required to clock out, and then had to undergo individualized security inspections, which necessitated that they remain on-premises fifteen to thirty minutes after they had clocked out.[14]

Employees purportedly remained under Nordstrom's control during the time they were waiting to be searched and undergoing a search by Nordstrom security officers.[15]  Because the security screening was for Nordstrom's benefit, Carranza alleges that the time employees spent

---

[9]*Id.*, ¶ 10.

[10]*Id.*

[11]*Id.*, ¶¶ 18-19.

[12]*Id.*, ¶ 19.

[13]*Id.*

[14]*Id.*

[15]*Id.*

participating in the security process was compensable; he contends that Nordstrom, as a matter of policy and practice, failed to compensate employees for time spent waiting to be screened at the end of a shift or after an employee had clocked out for a meal or rest period.[16]

## B.     The Putative Class and Subclasses

Carranza seeks to represent a class of "[a]ll current and former non-exempt employees employed by Defendants at NORDSTROM Fulfillment Centers in the State of California at any time beginning four years prior to the filing of this Complaint [and up] to the commencement of trial in this action[;] [the class] includes persons paid through third-party staffing agencies."[17] He also seeks to represent eight subclasses:[18]

| | |
|---|---|
| Unpaid Straight-Time Subclass: | All members of the proposed class who were subject to Defendants' policy and/or practice of requiring said employees to submit to individualized on-premises searches after having clocked-out in a given workday and who were not compensated by Defendants at their regular rate of pay for the amount of time it took to complete the security screening process; |
| Unpaid Overtime Subclass: | All members of the proposed class who were subject to Defendants' policy and/or practice of requiring said employees to submit to individualized on-premises searches after having clocked-out in a given workday and who were not compensated for the amount of |

---

[16]*Id.*, ¶¶ 18-23.

[17]*Id.*, ¶ 24.

[18]*Id.*, ¶ 25.

time it took to complete the security screening
at appropriate overtime rate of pay for hours
worked in excess of eight (8) hours in a day or
forty (40) in a workweek, or appropriate
double-time rate of pay for hours worked in
excess of twelve (12) hours in a day;

First Meal Period Subclass:   All members of the proposed class who were
subject to Defendants' policy and/or practice of
requiring said employees to submit to
individualized on-premises searches after
having clocked-out for their first meal period,
and who, as a result of the delay by the
security clearance process, were not provided
with full 30-minutes of uninterrupted, off-duty
meal period time and who were not provided
with compensation of one hour's pay at the
employee's regular rate of pay;

Second Meal Period Subclass:   All members of the proposed class who were
subject to Defendants' policy and/or practice of
requiring said employees to submit to
individualized on-premises searches after
having clocked-out for their second meal
period (for shifts exceeding 10 hours in length)
and who, as a result of the delay by
Defendants' security clearance process, were
not provided with full 30-minutes of
uninterrupted, off-duty meal period time and
who were not provided with compensation of

1   one hour's pay at the employee's regular rate

2   of pay;

3   Rest Period Subclass:        All members of the proposed class who worked

4   periods of four hours or major fraction thereof

5   who, as a result of defendants' policy and/or

6   practice of requiring said employees to submit

7   to individualized on-premises searches, were

8   not permitted to take an uninterrupted rest

9   period of at least 10 minutes in length, and

10  who were not paid compensation of one hour's

11  pay at the employee's regular rate of pay for

12  each such day that a full 10 minutes

13  uninterrupted rest period was not provided;

14  Waiting Time Subclass:       All members of the proposed class who, within

15  three years of the filing of the complaint, were

16  not paid all wages due at the time of their

17  respective separation/termination from the

18  company based on the defendants' failure to

19  pay all wages earned as a result of defendants'

20  individualized on-premises search policy

21  requirement;

22  Wage Statement Subclass:     All members of the proposed class who, within

23  one year of the filing of the complaint, were

24  subject to a company practice of failing to

25  accurately itemize wage statements as a result

26  of defendants' individualized on-premises

27  search policy requirement; and

28

6

| UCL Subclass: | All members of the proposed class who are entitled to the restitution of unpaid wages that occurred as a result of the employee being subject to defendants' on-premises search policy requirements. |

## C.     Carranza's Claims

On behalf of the class and subclasses, Carranza pleads claims for (1) failure to pay hourly wages in violation of California Labor Code §§ 204, 1194 and Industrial Welfare Commission ("IWC") Wage Order 2-2001;[19] (2) failure to pay overtime compensation in violation of California Labor Code §§ 204, 510, 1194 and IWC Wage Order 2-2001;[20] (3) failure to provide meal periods in violation of California Labor Code §§ 226.7, 512, IWC Wage Order 5, and California Code of Regulations, Title 8, § 11050;[21] (4) failure to provide rest periods in violation of California Labor Code §§ 226.7, 512, IWC Wage Order 5, and California Code of Regulations, Title 8, § 11050;[22] (5) waiting time penalties in violation of California Labor Code §§ 201-203;[23] (6) knowing and intentional failure to provide accurate itemized wage statements in violation of California Labor Code § 226;[24] (7) violation of California's Unfair Competition Law ("UCL"), California Business and Professions Code § 17200 *et seq.*;[25] and (8) a private attorney general ("PAGA") action under California Labor Code § 2698 *et seq.* for violations of the Labor Code.[26]

---

[19]*Id.*, ¶¶ 33-38.

[20]*Id.*, ¶¶ 39-42.

[21]*Id.*, ¶¶ 43-46.

[22]*Id.*, ¶¶ 47-50.

[23]*Id.*, ¶¶ 51-56.

[24]*Id.*, ¶¶ 57-59.

[25]*Id.*, ¶¶ 60-65.

[26]*Id.*, ¶¶ 66-69.

## II.  DISCUSSION

### A.      Legal Standard Governing Removal Jurisdiction

"Except as otherwise expressly provided by Act of Congress, any civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant or the defendants, to the district court of the United States for the district and division embracing the place where such action is pending." 28 U.S.C. § 1441(a). "If at any time before final judgment[, however,] it appears that the district court lacks subject matter jurisdiction, the case shall be remanded." 28 U.S.C. § 1447(c).

The right to remove a case to federal court is entirely a creature of statute. See *Libhart v. Santa Monica Dairy Co.*, 592 F.2d 1062, 1064 (9th Cir. 1979). The original removal statute, 28 U.S.C. § 1441, allows defendants to remove when a case originally filed in state court presents a federal question or is between citizens of different states and involves an amount in controversy that exceeds $75,000. See 28 U.S.C. §§ 1441 (a), (b); see also 28 U.S.C. §§ 1331, 1332(a). Only state court actions that could originally have been filed in federal court can be removed. 28 U.S.C. § 1441(a); see *Caterpillar, Inc. v. Williams*, 482 U.S. 386, 392 (1987); *Ethridge v. Harbor House Rest.*, 861 F.2d 1389. 1393 (9th Cir. 1988).

The Ninth Circuit "strictly construe[s] the removal statute against removal jurisdiction," and "[f]ederal jurisdiction must be rejected if there is any doubt as to the right of removal in the first instance." *Gaus v. Miles, Inc.*, 980 F.2d 564, 566 (9th Cir. 1992) (citing *Boggs v. Lewis*, 863 F.2d 662, 663(9th Cir. 1988), *Takeda v. Northwestern Nat'l Life Ins. Co.*, 765 F.2d 815, 818 (9th Cir. 1985), and *Libhart*, 592 F.2d at 1064). "The 'strong presumption' against removal jurisdiction means that the defendant always has the burden of establishing that removal is proper." *Id.* (citing *Nishimoto v. Federman-Bachrach & Assocs.*, 903 F.2d 709, 712 n. 3 (9th Cir. 1990); *Emrich v. Touche Ross & Co.*, 846 F.2d 1190, 1195 (9th Cir. 1988)). Doubts as to removability must be resolved in favor of remanding the case to state court. *Matheson v. Progressive Specialty Ins. Co.*, 319 F.3d 1089, 1090 (9th Cir. 2003).

1     **B.    Legal Standard Governing CAFA Jurisdiction**

2     Congress enacted the Class Action Fairness Act ("CAFA"), Pub. L. No. 109-2, 119 Stat.

3     4, in 2005 to enlarge the diversity jurisdiction of the federal courts.  CAFA gives district courts

4     original jurisdiction to hear class actions "in which the matter in controversy exceeds the sum or

5     value of $5,000,000, exclusive of interest and costs," and "in which[, *inter alia*,] any member of

6     a class of plaintiffs is a citizen of a State different from any defendant." 28 U.S.C. § 1332(d)(2);

7     see also *Luthis v. Countrywide Homes Loans Servicing LP*, 533 F.3d 1031, 1033-34 (9th Cir.

8     2008) ("The Class Action Fairness Act of 2005 § 4(a), 28 U.S.C. § 1332(d)(2), amended the

9     requirements for diversity jurisdiction by granting district courts original jurisdiction over class

10    actions exceeding $5,000,000 in controversy where at least one plaintiff is diverse from at least

11    one defendant.  In other words, complete diversity is not required.  CAFA also provided for such

12    class actions to be removable to federal court.  See 28 U.S.C. § 1453(b).  CAFA was enacted,

13    in part, to 'restore the intent of the framers of the United States Constitution by providing for

14    Federal court consideration of interstate cases of national importance under diversity jurisdiction.'

15    Pub. L. No. 109-2, § 2(b)(2), 119 Stat. 4, 5 (codified as a note in 28 U.S.C. § 1711)").

16    Under CAFA, the number of members of all proposed plaintiff classes must exceed 100

17    in the aggregate.  28 U.S.C. § 1332(d)(5)(B).  See also *Serrano v. 180 Connect, Inc.*, 478 F.3d

18    1018, 1020-21 (9th Cir. 2007) ("As a threshold matter, CAFA applies to 'class action' lawsuits

19    where the aggregate number of members of all proposed plaintiff classes is 100 or more persons

20    and where the primary defendants are not 'States, State officials, or other governmental entities

21    against whom the district court may be foreclosed from ordering relief.' § 1332(d)(5). . . .  Once

22    the prerequisites of § 1332(d)(5) are satisfied, CAFA vests federal courts with 'original' diversity

23    jurisdiction over class actions if (1) the aggregate amount in controversy exceeds $5,000,000, and

24    (2) any class member is a citizen of a state different from any defendant.  § 1332(d)(2)"); *id.* at

25    1021 n. 3 ("The Fifth Circuit characterized § 1332(d)(5) as an 'exception' to CAFA jurisdiction

26    conferred under § 1332(d)(2). . . .  We view § 1332(d)(5)somewhat differently. . . . [S]atisfaction

27    of § 1332(d)(5) serves as a prerequisite, rather than s an exception, to jurisdiction under

28    § 1332(d)(2).  This distinction is important because, as we address later, there are 'exceptions'

to the statute in which jurisdiction otherwise exists under § 1332(d)(2) but the federal courts either *may* or *must* decline to exercise that jurisdiction.  See, e.g., § 1332(d)(3)-(4)").

The Ninth Circuit has confirmed that CAFA does not disturb the traditional rule that the burden of establishing removal jurisdiction is on the proponent of federal jurisdiction.  *Abrego Abrego v. The Dow Chemical Co.*, 443 F.3d 676, 685 (9th Cir. 2006) ("We . . . hold that under CAFA the burden of establishing removal jurisdiction remains, as before, on the proponent of federal jurisdiction").

**C.**   **Whether the Court Has Jurisdiction Under CAFA**

**1.**   **Whether the Class is Sufficiently Numerous**

As noted under CAFA, the number of members of all putative classes must exceed 100 in aggregate.  28 U.S.C. § 1332(d)(5)(B).  In its notice of removal, Nordstrom proffers the declarations of Janis Walsh, its Vice President of Human Resources Operations, and Kristen Martin, the Vice President of Human Resources for Hautelook, a Nordstrom subsidiary.[27]  Based on their review of personnel records, Walsh states that approximately 98 non-exempt employees were continuously employed at the Nordstrom Distribution Centers during the class period, while Martin states that an average of 134 non-exempt employees were continuously employed at the Hautelook Fulfillment Center during the class period.[28]  It thus appears that there are at least 232 putative class members.  Accordingly, the court concludes that the class is sufficiently numerous to satisfy CAFA.[29]

---

[27]See Declaration of Janis Walsh re: Notice of Removal ("Walsh Removal Decl."), Docket No. 4 (Aug. 15, 2014); Declaration of Kristen Martin re: Notice of Removal ("Martin Removal Decl."), Docket No. 5 (Aug. 15, 2014).

[28]Walsh Removal Decl., ¶ 6; Marin Removal Decl., ¶ 4.

[29]Carranza does not dispute that the class satisfies CAFA's requirement that there be at least 100 class members.  (See Motion at 2 ("Although Nordstrom can establish that there are the requisite number of class members and that the action is between citizens of different states, as set forth herein, Defendant fails to meet its burden that the amount in controversy exceeds $5,000,000, and therefore, the case should be remanded to Superior Court").

### 2. Whether the Minimal Diversity Requirement is Satisfied

In its notice of removal, Nordstrom asserts that the minimal diversity requirement is satisfied because Carranza is a citizen of California and Nordstrom is a citizen of Washington.[30] Carranza concedes that the minimal diversity requirement is satisfied.[31]   Accordingly, the court finds that this prerequisite to jurisdiction is met.

### 3. Whether the Amount in Controversy Requirement is Satisfied

#### a. Legal Standard Governing the Amount in Controversy under CAFA

While the class is sufficiently numerous, and there is minimal diversity, Carranza contends that Nordstrom has failed to establish that the amount in controversy exceeds $5,000,000.[32] "[W]hen the plaintiff fails to plead a specific amount of damages, the defendant seeking removal 'must prove by a preponderance of the evidence that the amount in controversy requirement has been met.'"   *Lowdermilk v. U.S. Bank National Ass'n*, 479 F.3d 994, 998 (9th Cir. 2007) (quoting *Abrego Abrego*, 443 F.3d at 684).   See also *Guglielmino v. McKee Foods Corp.*, 506 F.3d 696, 699 (9th Cir. 2007) ("[W]here it is unclear or ambiguous from the face of a state-court complaint whether the requisite amount in controversy is pled . . . we apply a preponderance of the evidence standard"); *Matheson v. Progressive Specialty Ins. Co.*, 319 F.3d 1089, 1090 (9th Cir. 2003) (per curiam); *Singer v. State Farm Mutual Auto. Ins. Co.*, 116 F.3d 373, 376 (9th Cir. 1997). "[I]f the complaint alleges damages in excess of the federal amount-in-controversy requirement, [however,] then the amount-in-controversy requirement is presumptively satisfied unless 'it appears to a 'legal certainty' that the claim is actually for less than the jurisdictional minimum.'"   *Roth v. Comerica Bank*, 799 F.Supp.2d 1107, 1116 (C.D. Cal. 2010) (quoting *Lowdermilk*, 479 F.3d at 998 (in turn quoting *Abrego Abrego*, 443 at 683 n. 8)).

---

[30]Removal, ¶¶ 15-17.

[31]Motion at 2.

[32]*Id.*

11

Here, Carranza's state court complaint affirmatively pleads an amount in controversy less than $5,000,000:

> "The California Superior Court also has jurisdiction in this matter because the claims of the individual members of the class are under the seventy-five thousand dollar ($75,000) jurisdictional threshold for Federal Court and the aggregate claims are under the five million dollar ($5,000,000.00) threshold of the Class Action Fairness Act of 2005. Plaintiff seeks only damages related to having to go through security after having to clock out."[33]

In cases such as this, where the state court complaint affirmatively pleads an amount in controversy below the jurisdictional threshold, courts in the Ninth Circuit previously employed the "legal certainty" standard set forth in *Lowdermilk* to determine whether the jurisdictional minimum was satisfied. In *Lowdermilk*, the Ninth Circuit held that when a plaintiff pleads an amount in controversy that is *less than* the jurisdictional minimum, a defendant seeking to remove the case under CAFA must show to a "legal certainty" that the jurisdictional amount is at issue. *Lowdermilk*, 479 F.3d at 999. The court identified two principles informing this conclusion: "First, as federal courts, we are courts of limited jurisdiction and we will strictly construe our jurisdiction. Second, it is well-established that the plaintiff is 'master of her complaint' and can plead to avoid federal jurisdiction." *Id.* at 998-99 (citations omitted).

This rule changed after the United States Supreme Court's decision in *Standard Fire Insurance Company v. Knowles*, 133 S.Ct. 1345 (2013). Knowles filed a class action, alleging that he and the "[c]lass stipulate[d] they [would] seek to recover total aggregate damages of less than [the CAFA jurisdictional threshold of] five million dollars." Defendants removed. *Id.* at 1348. The district court remanded. It found that although the amount in controversy would have exceeded $5,000,000 in the absence of the stipulation, it could not be met given the stipulation. *Id.* The Supreme Court held that the district court erred in relying on the stipulation because "a

---

[33]Complaint, ¶ 4.

plaintiff who files a proposed class action cannot legally bind members of the proposed class before the class is certified." *Id.* at 1349.

The Ninth Circuit has recognized that *Standard Fire* overruled *Lowdermilk*'s "legal certainty" standard in CAFA cases where a class action plaintiff alleges that the amount in controversy is less than the jurisdictional minimum. See *Rodriguez v. AT&T Mobility Services, LLC*, 728 F.3d 975, 977 (9th Cir. 2013) ("Our reasoning . . . for imposing on defendants the burden to prove the amount in controversy to a legal certainty, rather than the ordinary preponderance of the evidence standard, is clearly irreconcilable with the Supreme Court's reasoning in *Standard Fire*"). The court held that the second principle informing the *Lowdermilk* rule – to "preserve the plaintiff's prerogative . . . to forgo a potentially larger recovery to remain in state court" – was "directly contradicted by *Standard Fire*['s holding that] a plaintiff seeking to represent a putative class [cannot] evade federal jurisdiction by stipulating that the amount in controversy [falls] below the jurisdictional minimum." *Id.* at 980-81. The court also concluded that *Standard Fire* had overruled *Lowdermilk*'s directive that district courts "need not look beyond the four corners of the complaint to determine whether the CAFA jurisdictional amount is met," and that § 1332(d) required district courts to evaluate the potential claims of absent class members rather than plaintiff's complaint. *Id.* at 981.

Because the *Lowdermilk* "legal certainty" standard no longer applies, Nordstrom must, to invoke federal jurisdiction under CAFA, prove by a preponderance of the evidence that the complaint places more than $5,000,000 in issue. See, e.g., *Rodriguez*, 728 F.3d at 981 ("A defendant seeking removal of a putative class action must demonstrate, by a preponderance of evidence, that the aggregate amount in controversy exceeds the jurisdictional minimum. This standard conforms with a defendant's burden of proof when the plaintiff does not plead a specific amount in controversy"); *Vasquez v. First Student, Inc.*, No. 2:14-CV-06760 ODW(Ex), 2014 WL 6837279, *3 (C.D. Cal. Dec. 3, 2014) ("Lastly, CAFA requires the 'matter in controversy' to exceed 'the sum or value of $5,000,000 exclusive of interest and costs.' 'The claims of individual class members shall be aggregated to determine whether the matter in controversy exceeds' this amount. Although Plaintiff attempts to cap the putative class' damages at less than

$5 million, that allegation cannot defeat removal.  Therefore, this court agrees with Defendants that Plaintiff's cap on the amount in controversy should be disregarded and the Court should apply the preponderance of the evidence standard with respect to the amount in controversy"); *Emmons v. Quest Diagnostics Clinical Laboratories, Inc.*, No. 1:13-CV-0474 AWI-BAM, 2014 WL 584393, *2, 4 (E.D. Cal. Feb. 12, 2014) (holding, where the complaint alleged that "the aggregate amount in controversy for the proposed class action, including monetary damages, restitution, penalties, injunctive relief, and attorneys' fees, is less than five millions dollars," that defendant could prove the CAFA jurisdictional minimum was satisfied by a preponderance of the evidence).

> **b.     Whether Nordstrom Has Shown by a Preponderance of the Evidence that the Amount in Controversy Exceeds $5,000,000**

Nordstrom's estimate of the amount in controversy is based on six types of relief sought in Carranza's complaint:

| No. | Claim | Nordstrom's Estimated Amount in Controversy[34] |
|---|---|---|
| 1. | Off the Clock Work | $1,175,448-$3,526,344 |
| 2. | Meal and Rest Period Premiums | $1,880,718-$9,403,591 |
| 3. | Waiting Time Penalties | $607,198-$971,743 |
| 4. | Inaccurate Wage Statements | $1,081,000 |
| 5. | Penalties under PAGA | $1,049,000 |
| 6. | Attorneys' Fees | $350,000-$1,448,441 |
| | **TOTAL** | **$6,143,364-$17,480,119** |

In estimating the value of the class claims, Nordstrom has calculated the potential recovery for off the clock work and meal and rest period claims for the four-year class period alleged in the complaint; it has assumed, by contrast, that a one-year statute of limitations applies to claims

---

[34]Opposition at 19.

under Labor Code § 226 and PAGA.[35]  In estimating waiting time penalties under Labor Code § 203, Nordstrom calculated possible penalties for the 283 putative class members who left its employ since July 15, 2011.[36]  Although Carranza does not dispute Nordstrom's use of a four year limitations period in calculating the amount in controversy on his unpaid wages, overtime, and period and rest break claims, it is incorrect as a matter of law,[37] and has inflated Nordstrom's estimate of damages on the two claims by at least 25 percent.[38]

Beyond this problem in calculation, Carranza contends that "Nordstrom overstates the potential damages and relies on inadmissible evidence in an effort to reach the CAFA requirement

---

[35]Removal, ¶¶ 26-27, 29-30.

[36]*Id.*, ¶ 28.

[37]The California Supreme Court has held that "[a] three-year statute of limitations applies to [claims for wages] (Code Civ. Proc., § 338, subd. (a)) ('An action upon a liability created by statute, other than a penalty or forfeiture'), while a one-year of statute of limitations governs claims for penalties (Code Civ. Proc., § 304, subd. (a)) ('An action upon a statute for penalty or forfeiture')."  *Murphy v. Kenneth Cole Productions, Inc.*, 40 Cal.4th 1094, 1102, 1120 (2007) (affirming use of a three-year statute of limitations for claims under California Labor Code § 226.7 for missed meal/rest periods); see also *Gentry v. Superior Court*, 42 Cal.4th 443, 470-71 (2007) (noting that generally California Code of Civil Procedure § 338's three-year statute of limitations applies to claims for overtime wages), overruled on other grounds by *AT & T Mobility LLC v. Concepcion*, __ U.S. __, 131 S.Ct. 1740 (2011).  If the correct three-year statute of limitations is used to calculate possible damages on Carranza's unpaid wages, overtime, meal period, and rest period claims, Nordstrom's estimate of potential damages on the claims is overstated by a minimum of 25 percent, and perhaps by more, depending on the number of class members who were employed during the past three years as opposed to the past four years.

[38]Carranza alleges that the class period on his unpaid wages, overtime, meal period, and rest break claims commenced four years prior to the filing of the complaint.  (See Complaint, ¶¶ 24, 25(A), (B), (C), (D), (E).)  He may have done so because his Business and Professions Code § 17200 claim is governed by a four-year limitations period.  See CAL. BUS. & PROF. CODE § 17208 ("Any action to enforce any cause of action pursuant to this chapter shall be commenced within four years after the cause of action accrued").  Although Nordstrom used a four-year class period in estimating damages on the unpaid wages, overtime, meal period, and rest break claims, none of its calculations is based on the § 17200 claim.  It thus overstates damages on those claims.

of $5 million."  He disputes each amount Nordstrom calculates in its notice of removal and its opposition to the motion to remand.[39]  The court consider each estimate in turn.

### (1) Off the Clock Work

In estimating that the class could potentially recover $1,175,448 to $3,526,344 on the unpaid wages claim, Nordstrom assumed that putative class members spent one hour per week undergoing security screening after they clocked out for meal periods or rest breaks and at the end of their shift.[40]  Based on this assumption, it calculated estimated damages for employees who worked at Nordstrom fulfillment centers in California during the class period, and added the resulting number to its estimate of damages for employees working at the Hautelook Fulfillment Center.[41]

Nordstrom's one hour per day estimate is based on allegations in Carranza's complaint. He alleges that putative class members were not paid for "as much as 15-30 minutes" on a typical day.[42]  Nordstrom notes that payroll records indicate that employees at the Hautelook Fulfillment Center worked an average of 4.5 days per week.[43]  Since Carranza alleges that all class members were similarly situated, Nordstrom assumes that those working at Nordstrom Fulfillment Centers worked a similar schedule.[44]  Using the low end of Carranza's estimated range, it calculated one hour of unpaid time per week.[45]  If its assumption concerning the number of hours worked by all class members is supported, Nordstrom's estimate would appear to be conservative, as an estimate twice as large would be equally supported by Carranza's allegations.

---

[39]Motion at 5.

[40]See Removal at 11; Opposition at 10-11.

[41]Removal at 11.

[42]Complaint, ¶ 11.

[43]Martin Decl., ¶ 7.

[44]Removal at 12 n. 7.

[45]*Id.* at 11.

Kristen Martin, Hautelook's Vice President of Human Resources, proffers reliable evidence concerning the number of putative class members employed at the Hautelook Fulfillment Center during the class period,[46] their average hourly rate of pay,[47] the total number of weeks they worked during the class period,[48] and the average number of days they worked per week.[49] Her evidence supports the conclusion that from June 2012 to December 2013, Hautelook Fulfillment Center employees worked an average 4.5 days each week for 10,988 workweeks, at an average hourly rate of $10.33. Using these numbers and its assumption that Hautelook employees were not paid for approximately 15 minutes per day due to time in security screening, Nordstrom estimates that the amount in controversy on the unpaid wages and overtime claims of Hautelook class members is $113,506.[50]

With respect to putative class members working at its other fulfillment centers, Nordstrom proffers competent evidence concerning the number of putative class members during the class period, their average hourly rate of pay, and the total number of workweeks during the class period that they worked. Walsh states that at least 98 putative class members worked a total of 62,504 workweeks during the class period at an average hourly rate of $16.99.[51] Based on this

---

[46]See Martin Removal Decl., ¶ 4 ("Hautelook employed an average of 134 individuals at any given time as hourly, non-exempt employees").

[47]*Id.*, ¶ 6 ("Based on data available to Hautelook from its records, which were created and stores in the regular course of Hautelook's operations, the average base hourly rate for Hautelook Fulfillment Center employees was $10.33 per hour").

[48]*Id.*, ¶ 5 ("From June 2012 to December 2013, all Hautelook Fulfillment Center employees worked a total of approximately 10,988 workweeks").

[49]*Id.*, ¶ 7 ("Based on the data available to Hautelook from its records, Hautelook Fulfillment Center employees worked an average of just over 4.5 days per week").

[50]Removal at 11. The estimated damages are calculated by multiplying 15 minutes of unpaid time per day by four days per week, and multiplying the resulting number by the average rate of $10.33 per hour. This product is then multiplied by 10,988 workweeks to reach total estimated unpaid wages for Hautelook Fulfillment Center employees during the class period.

[51]Walsh Removal Decl., ¶¶ 6-7.

evidence, and on the assumption that putative class members working at Nordstrom's other distribution centers worked an average of 4.5 days per week – just as employees at the Hautelook Fulfillment Center did – and were not compensated for 15 minutes on each of four days, Nordstrom estimates that the claims of class members at its California fulfillment centers place approximately $1,061,942 in controversy.[52]

Carranza argues that Nordstrom has failed to meet its burden of showing the amount in controversy on these claims by a preponderance of the evidence.[53]  He asserts that Nordstrom has "fail[ed] to proffer any evidence of the average number of hours worked, daily or weekly, [by] Nordstrom's California Distribution Center employees," and thus that its estimate of $1,061,942 in damages attributable to these class members should not be considered because it is speculative and without evidentiary support.[54]  The court agrees with Carranza that Nordstrom's estimated damages are unsupported to the extent they are premised on the assumption that the 98 putative class members employed at Nordstrom's other fulfillment centers worked an average of 4.5 days per week.

Nordstrom argues in its notice of removal that the estimate is "well supported" and that it is proper "to assume that Nordstrom Distribution Center employees worked a similar schedule [to that worked by Hautelook employees], particularly because [p]laintiff asserts in his [c]omplaint that all such employees are similarly situated."[55]  An allegation that Carranza seeks to represent a class of individuals who are "similarly situated" does not support Nordstrom's assumption that all employees worked an average of 4.5 days per week.  Rather, the allegation, which is common

---

[52]Removal at 11.  The estimated damages are calculated by multiplying 15 minutes of unpaid time per day by four days per week, and multiplying the resulting number by the average rate of $16.99 per hour.  This product is then multiplied by 62,504 workweeks to reach total estimated unpaid wages for putative class members working at the other Nordstrom fulfillment centers during the class period.

[53]Motion at 8-10.

[54]*Id.* at 11.

[55]Removal at 12.

18

to all putative class actions, suggests that the class members were "similarly situated" to the extent they were each "current and former non-exempt employees employed by [Nordstrom] at N[ordstrom] Fulfillment Centers in the State of California."[56]  See, e.g., *Martinez v. Morgan Stanley & Co. Inc.*, Civil No. 09cv2937–L(JMA), 2010 WL 3123175, *5 (S.D. Cal. Aug. 9, 2010) ("Although Plaintiff alleged that her claims are typical of the class as a whole and that class members consistently worked overtime, this does not provide a basis to assume that every class member worked any particular number of overtime hours").  Nordstrom has proffered no evidence concerning the average number of hours worked by employees in its California distribution centers, despite the fact that it is in possession of records that would allow it to ascertain that information.  There are, moreover, no allegations in Carranza's complaint that support an inference that Hautelook Fulfillment Center employees worked the same or similar hours as employees at other Nordstrom distribution centers.

Nordstrom contends that requiring it to proffer evidence that supports its *assumption* that workers employed at its other fulfillment centers worked 4.5 hours a day would necessitate that it "research, state, and prove [ ] [Carranza's] claims for damages."[57]  The court cannot agree. A removing defendant need not "conduct a fact-specific inquiry into whether the rights of each and every potential class member were violated," answering "the ultimate question the litigation presents," or "try[ing] the case [itself] for the purposes of establishing jurisdiction." *Bryan v. Wal-Mart Stores, Inc.*, No. C 08-5221 SI, 2009 WL 440485, *3 (N.D. Cal. Feb. 23, 2009). Nonetheless, in evaluating whether a party has met its burden of showing that the court has subject matter jurisdiction, several circuit courts have held that it is proper to consider which party has access to or control over the records and information required to determine whether the amount in controversy requirement is met.  See, e.g., *Amoche v. Guarantee Trust Life Insurance Co.*, 556 F.3d 41, 51 (1st Cir. 2009) ("[D]eciding whether a defendant has shown a reasonable probability that the amount in controversy exceeds $5 million may well require analysis of what *both* parties

---

[56]See Complaint, ¶ 24.

[57]Opposition at 11.

have shown. . . .   In the course of that evaluation, a federal court may consider which party has better access to the relevant information.  See *Evans v. Walter Indus., Inc.*, 449 F.3d 1159, 1164 n. 3 (11th Cir. 2006) ('Defendants have better access to information about conduct by defendants, but plaintiffs have better access to information about which plaintiffs are injured and their relationship to various defendants')"); *Brill v. Countrywide Home Loans, Inc.*, 427 F.3d 446, 447-48 (7th Cir. 2005) ("That the proponent of jurisdiction bears the risk of non-persuasion is well established. . . .  Whichever side chooses federal court must establish jurisdiction; it is not enough to file a pleading and leave it to the court or the adverse party to negate jurisdiction. . . .  And the rule makes practical sense.  If the burden rested with the proponent of remand, then Countrywide could have removed without making any effort to calculate its maximum exposure, and without conceding that it had faxed thousands of ads.  That would have thrown on Brill the burden of showing that Countrywide could not possibly have sent more than 3,333 junk faxes. . . .  Brill would have no way to show this early in the litigation, and plaintiffs in other kinds of suits would encounter similar difficulty.  When the defendant has vital knowledge that the plaintiff may lack, a burden that induces the removing party to come forward with the information – so that the choice between state and federal court may be made accurately – is much to be desired").

Here, as noted, Nordstrom is in the best position to adduce evidence regarding the average number of days employees at its distribution centers worked.  Nordstrom could have sampled class members' payroll records, or otherwise analyzed those records to provide some evidentiary support for its assertion that the average number of days worked by employees at the Nordstrom distribution centers is the same as the average number of hours worked by employees at the Hautelook Fulfillment Center.  That Nordstrom had the ability to engage in this type of analysis is clear from the reply declaration submitted by Walsh; in it, he recounts a review of payroll records for all facilities, and concludes, based on that review, that the average number of hours worked per day by employees at the Hautelook Fulfillment Center and the Nordstrom distribution

centers was 7.995 hours per day.[58] Nordstrom could likewise have determined the average number of days worked per week by all putative class members, not just those in the Hautelook facility. Adducing such evidence would not have required that Nordstrom prove Carranza's claims or answer the "ultimate question" presented by the litigation in any way. Nordstrom, however, failed to do so, or to proffer evidence supporting its assumption concerning the average number of worked each week by employees in its distribution centers. Consequently, the court concludes that its calculation of the amount in controversy on Carranza's unpaid wages and overtime claims is speculative. The court therefore declines to consider the estimated amounts in determining whether damages at issue exceed $5,000,000.[59]

Indeed, even had Nordstrom adduced evidence concerning the average number of days worked by its distribution center employees, the court would decline to consider its proffered

---

[58]See Declaration of Janis Walsh in Support of Nordstrom's Opposition to Motion to Remand, ("Walsh Supp. Decl."), Docket No. 16-1 (Nov. 24, 2014), ¶ 7.

[59]Nordstrom cites Judge Frank C. Damrell, Jr.'s order in *Muniz v. Pilot Travel Centers LLC*, No. CIV S-07-0325 FCD EFB, 2007 WL 1302504, *2 (E.D. Cal. May 1, 2007), as support for its assertion that requiring it to adduce evidence of the average number of days worked by putative class members employed at Nordstrom fulfillment centers other than the Hautelook facility would require it to "research, state, and prove the plaintiff's claims for damages." (Opposition at 11.) The court finds *Muniz* unpersuasive, as it improperly shifts the burden to plaintiff to refute speculative assertions of jurisdiction and establish that there is no jurisdiction. See *Abrego Abrego*, 443 F.3d at 685 ("We . . . hold that under CAFA the burden of establishing removal jurisdiction remains, as before, on the proponent of federal jurisdiction"). Plaintiffs are not required affirmatively to disprove speculative calculations of the amount in controversy to avoid removal. See *Smith v. Brinker Int'l, Inc.*, No. C 10-0213 VRW, 2010 WL 1838726, *4 (N.D. Cal. May 5, 2010) ("Defendants suggest that plaintiffs have not submitted evidence to dispute defendants' estimates, but plaintiffs do not bear the burden to demonstrate the amount in controversy").

Moreover, by crediting speculative estimates of the amount in controversy, courts that allow defendants to rely on assumed violation rates ignore the "'strong presumption' against removal jurisdiction." *Gaus*, 980 F.2d at 566 (citing *Nishimoto*, 903 F.2d at 712 n. 3, and *Emrich*, 846 F.2d at 1195). See also *id.* (the Ninth Circuit "strictly construe[s] the removal statute against removal jurisdiction," citing *Boggs*, 863 F.2d at 663; *Takeda*, 765 F.2d at 818). "Federal jurisdiction must be rejected if there is any doubt as to the right of removal in the first instance," and "[t]he 'strong presumption' against removal jurisdiction means that the defendant always has the burden of establishing that removal is proper." *Id.* (citing *Libhart*, 592 F.2d at 1064).

damages number in determining the amount in controversy.  As noted, Walsh states that, during the four years preceding the filing of the complaint, Nordstrom employed an average of 98 distribution center employees, and that these 98 employees worked 62,504 workweeks during that period.[60]  This statement cannot be correct.  Assuming 98 distribution center employees worked 52 workweeks per year for four years, they would have worked 20,384 workweeks.[61]  Nordstrom would have had to employ an average of *300 employees* for four years to reach the number of workweeks that Walsh estimates were worked by 98 distribution center employees between July 15, 2010 and the filing of the complaint on July 15, 2014.[62]  Put differently, it would take 98 employees some twelve years to work 62,504 workweeks.  Neither Walsh nor Nordstrom explains this figure and, for the reasons stated, it appears to be inaccurate and vastly overstated. Accordingly, the court declines to consider the amount Nordstrom estimates is in controversy with respect to the unpaid wages/overtime claims of California distribution center employees for this reason as well.

Based on the evidence proffered by Nordstrom in its notice of removal and opposition to Carranza's motion to remand, it has demonstrated only that approximately $113,506 is placed in issue as a result of Carranza's unpaid wages claims.[63]

---

[60]See Walsh Removal Decl., ¶ 6.

[61](52 x 4) = 208 x 98 = 20,384.

[62]62,504 workweeks/4 years = 15,626 total workweeks per year/52 workweeks per employee per year = 300.5 employees.

[63]In its opposition to Carranza's remand motion, Nordstrom notes that its unpaid wages estimate was based on class members' average straight time hourly rate, and did not take into account overtime compensation to which they may have been entitled.  (Opposition at 12.)  Given the fact that the average putative class member worked 7.99 hours per day, Nordstrom asserts it is reasonable to infer that any uncompensated time attributable to its security screening policy would have resulted in unpaid overtime.  (*Id.*)  This assumption is reasonable given the evidence Nordstrom has adduced that class members worked on average at least 7.99 hours per day, and Carranza's allegation that *each day*, class members were not paid for 15 to 30 minutes of time spent in the security screening.  Even assuming class members were entitled to overtime pay for going through screening, however, the evidence adduced by Nordstrom supports class damages

### (2)    Meal and Rest Period Premiums

In estimating a combined total of $1,880,718 to $9,403,591 in class damages for missed meal periods and rest breaks, Nordstrom assumes that each class member worked an average of four days per week, and missed both a meal period and a rest break each work day. This is a total of eight violations per work week.[64] To calculate potential damages for class members employed

---

of $170,314 – multiplying 1 hour of unpaid time per week by the average premium rate of pay of $15.50 per hour, and multiplying the resulting number by 10,988 workweeks.

The court notes that the $113,506 figure does not reflect hours worked during the entire statutory period; Martin offers information only for the period from June 2012 to December 2013. (See Walsh Removal Decl., ¶ 5.) Although the class damages alleged were incurred prior to June 2012, and after December 2013, Nordstrom has proffered no competent evidence from which the court could estimate the additional amount at stake for these periods. There is no evidence in the record that Hautelook Fulfillment Center employees were paid an average of $13.30 per hour between July 15, 2010 and June 2012 (or between July 15, 2011, the actual start of the statutory period, and June 2012), that 134 non-exempt hourly employees worked at the fulfillment center during that period or that they worked on average 4.5 days per week. As the party seeking removal, Nordstrom bears the burden of adducing such evidence; it did not, and the court declines to speculate as to the additional damages that Hautelook Fulfillment Center employees may be able to claim absent evidence in the record.

[64]Removal at 12.  Labor Code § 226.7 provides: "If an employer fails to provide an employee a meal period or rest period in accordance with an applicable order of the Industrial Welfare Commission, the employer shall pay the employee one additional hour of pay at the employee's regular rate of compensation *for each work day* that the meal or rest period is not provided." CAL. LAB. CODE § 226.7(c).  Federal courts in California are split as to whether this statute permits the recovery of only one hour's wages per day, even if both a meal period and a rest break were denied, or whether it authorizes the employee to recover one hour for each violation. Compare *Roth v. Comerica Bank*, 799 F.Supp.2d 1107, 1120 (C.D. Cal. 2010) ("an employee is entitled to an additional hour's wages per day, even if denied both a rest and meal period during that day"); *Lyon v. W.W. Grainger, Inc.*, No. C 10–00884 WHA, 2010 WL 1753194, *4 (N.D. Cal. Apr. 29, 2010) (holding that defendant's calculation of the amount in controversy with respect to missed meal and rest breaks was too high because it assumed "recovery for each violation instead of one recovery per day"); *Corder v. Houston's Restaurants, Inc.*, 424 F.Supp.2d 1205, 1207 n. 2 (C.D. Cal. 2006) ("the plain wording of the statute is clear that an employer is liable per work day, rather than per break not provided") with *Marlo v. United Parcel Service, Inc.*, No. CV 03–04336 DDP (RZx), 2009 WL 1258491, *7 (C.D. Cal. May 5, 2009) ("Marlo may recover up to two additional hours of pay on a single work day for meal period and rest break violations: one if any meal period violation[ ] occur in a work day and one if any rest break violation[ ] occur in a work day.  However, if more than one rest period violation occurs in a single work day but no meal period violation[ ] occur[s], Marlo may only

at the Hautelook Fulfillment Center, Nordstrom multiplied 10,988 workweeks by eight violations, and multiplied the resulting number by an average rate of $10.33 per hour.[65]  It performed a similar calculation to determine the potential damages suffered by putative class members who worked at other Nordstrom fulfillment centers during the class period.[66] This generated total possible damages on the meal period and rest break claims of $9,403,591.[67] To ensure a

---

recover one additional hour of pay for all of the rest period violations combined; likewise, if more than one meal period violation occurs in a single work day but no rest period violation[ ] occur[s] on that day, Marlo may only recover one additional hour of pay for all of the meal period violations combined").

In 2011, the California Court of Appeal, however, held that "it is more reasonable to construe the statute as permitting up to two premium payments per workday – one for failure to provide one or more meal periods, and another for failure to provide one or more rest periods." *United Parcel Service, Inc. v. Superior Court*, 196 Cal.App.4th 57, 69 (2011).  While a single employee may not recover more than two premium payments for a single workday (even if he or she missed more than two meal or rest breaks), the Court of Appeal concluded that this reading was more consistent with the statute's legislative history and remedial purpose. *Id.* at 69–70.  The Ninth Circuit has stated that when applying California law, federal district courts should follow precedential decisions by the California Court of Appeal.  See *In re Watts*, 298 F.3d 1077, 1083 (9th Cir.2002) (suggesting that deference is owed to state appellate courts, and that "the federal courts must follow the decision of the intermediate appellate courts of the state unless there is convincing evidence that the highest court of the state would decide differently").  Consequently, the court concludes that Nordstrom is entitled to assume the need to compensate employees two hours for each day that both a meal period and rest break was missed or interrupted.

[65]Removal at 12 (8 x 10,988) x $10.33 = $908,048.00.  As noted, this calculation does not reflect hours worked during the entire statutory period, as Martin offers information only for the period from June 2012 to December 2013.  For reasons already stated, however, the court declines to extrapolate from the number in what could only be a speculative manner.  See note 63 *supra*.

[66]*Id*.  (8 x 62,504) x $16.99 = $8,495,543.00.  As noted, Nordstrom's estimate that 98 employees worked 62,504 workweeks in the four years preceding Carranza's filing of this action is inaccurate.  See *supra* at 22.  In combination with issues concerning Nordstrom's estimate of damages for distribution center employees discussed *infra*, this causes the court to conclude that the $8.495 million number is speculative and unsupported and should not be considered in determining whether the court has jurisdiction under CAFA.

[67]*Id*.

"conservative" estimate, it then calculated 20 percent of that amount, or $1,880,718. It asserts that it "relies on" this figure for purposes of estimating the amount in controversy.[68]

Nordstrom's damages estimate assumes a 100 percent violation rate, i.e., that each class member suffered both a meal period and rest break each day during the class period. Although Carranza does not challenge Nordstrom's assumption of a 100 percent violation rate,[69] courts have, in many cases, refused to credit defendants' speculative assumption of a 100 percent violation rate in the absence of summary-judgment type evidence or allegations in the complaint supporting it. See, e.g., *Garibay v. Archstone Communities LLC*, 539 Fed. Appx. 763, 764 (9th Cir. Aug. 27, 2013) (Unpub. Disp.) ("Garibay alleged violations of Cal. Labor Code § 226.7, which provides that employers who fail to provide adequate meal or rest breaks must compensate the employee for an additional hour of pay. Archstone assumes that each class member was wrongly denied a break twice each week. As the district court correctly explained, Archstone failed to provide any evidence regarding why the assumption that each employee missed two rest periods per week was more appropriate than 'one missed rest period per paycheck or one missed rest period per month'"); *Marshall v. G2 Secure Staff, LLC*, No. 2:14–cv–04322–ODW(MANx), 2014 WL 3506608, *2 (C.D. Cal. July 14, 2014) (stating that even where plaintiff's allegations are so non-specific that it would be appropriate to assume a 100 percent violation rate, defendant may not do so "*without supporting the assumption with evidence*" (emphasis original)); *Weston v. Helmerich & Payne Int'l Drilling Co.*, No. 1:13–cv–01092–LJO–JLT, 2013 WL 5274283, *5–6 (E.D. Cal. Sept. 16, 2013) (citing and following *Garibay*); *Martinez*, 2010 WL 3123175 at *6 ("Plaintiff alleged that she 'frequently missed meal and rest periods' and that '[i]t was the environment at Morgan Stanley for Assistants to forego and work through his/her statutory rights to rest breaks.' . . . Based on the foregoing, Defendants assume that assistants were not provided three rest or meal breaks per week. This assumption is unsupported by the allegations in the complaint or the evidence").

---

[68]*Id.*

[69]See Motion at 11-12.

Nordstrom asserts that Carranza's allegations support its use of a 100 percent violation rate.  Carranza alleges that Nordstrom had an "overarching, systemic, and uniform company practice" of subjecting employees to security screening.  He contends this resulted "in interrupted and shortened meal periods, interrupted or shortened rest periods (or no rest period due to the hassle) and extended time at work under Nordstrom's control to get through the often 20-25 minute line to exit the premises."[70]  The complaint, however, neither expressly pleads nor supports an inference that all class members sought to leave Nordstrom' premises for at least one rest break per day and one meal period per day.  Carranza's allegations, in fact, inferentially indicate that not all employees sought to leave the premises for rest periods.  He notes that "*if* [an] employee sought to leave the employer[']s secured area" for rest breaks, he or she was subjected to security screening.[71]  Carranza does not allege that all employees left the secured area for breaks, and it is not intuitively obvious that they would do so for a ten-minute break.  Nordstrom, moreover, adduces no evidence that employees could not take breaks in the secured area, nor does it proffer any other information that would support an assumption that all employees left the secured area during rest breaks and were subjected to screening.  Consequently, its assumption that each class member suffered two violations per day is speculative and unsupported.

Additionally, even if it were to credit Nordstrom's assumption of the 100 percent violation rate, the court could not credit its estimate of class damages on the meal period and rest break claims.  This is because it rests on the same unsupported assumption as its calculation of potential damages on the unpaid wages and overtime claims – i.e., that class members employed at Nordstrom distribution centers worked the same 4.5 days per week as employees at the Hautelook Fulfillment Center.  As noted, Nordstrom has adduced no evidence supporting this assumption.  Thus, the court cannot consider Nordstrom's calculation of the damages class members employed at Nordstrom distribution centers during the class period potentially suffered due to shortened or missed meal periods and rest breaks.  See, e.g., *De Leon v. NCR Corp.*, No. C 12–01637 SBA,

---

[70]See Complaint, ¶¶ 1-2, 7, 9, 18.

[71]*Id.*, ¶ 9.

2013 WL 503092, *4 (N.D. Cal. Feb. 8, 2013) ("The Court cannot credit Defendant's damages calculation because it is predicated on an assumption that has no basis either in the complaint's plain language or in any 'summary-judgment-type' evidence"); *Korn v. Polo Ralph Lauren Corp.*, 536 F.Supp.2d 1199, 1205 (E.D. Cal. 2008) ("[A] defendant must set forth the underlying facts supports its assertion that the amount in controversy exceeds the statutory minimum"); *Kenneth Rothschild Trust v. Morgan Stanley Dean Witter*, 199 F.Supp.2d 993, 1001 (C.D. Cal. 2002) ("If the amount in controversy is not clear on the face of the complaint, . . . defendant must do more than point to a state law that might allow recovery above the jurisdictional minimum").

When calculations based on this unsupported assumption are removed, the total amount in controversy for Carranza's meal and rest period claims is a range of $181,609.60 to $908,048.00, even crediting Nordstrom's assumption of a 100 percent violation rate.

### (3)   Waiting Time Penalties

California Labor Code § 203(a) states in relevant part: "If an employer willfully fails to pay, without abatement or reduction, in accordance with Sections 201, 201.3, 201.5, 202, and 205.5, any wages of an employee who is discharged or who quits, the wages of the employee shall continue as a penalty from the due date thereof at the same rate until paid or until an action therefor is commenced; but the wages shall not continue for more than 30 days."

In estimating the potential class recovery on Carranza's waiting time penalties claim under § 203, Nordstrom presumes that each of 283 putative class members who separated from Nordstrom during the class period did not receive wages he or she was due for a full thirty days.[72] Carranza does not dispute the propriety of this variable, nor can he; Carranza alleges in his complaint that "[m]ore than thirty days have passed since [p]laintiff and members of the Waiting Time Subclass left [d]efendants' employment." He also asserts that "the California Class Members whose employment ended during the class period are entitled to thirty days' wages under Labor Code section 203."[73] Carranza's allegations support a reasonable inference that each of the

---

[72]*Id.* at 13.

[73]Complaint, ¶¶ 54, 56.

283 putative class members who separated from Nordstrom during the class period did not receive wages due for at least thirty days.

Nordstrom also assumes that each of these class members worked an average of five hours per day.[74]   Although Carranza asserts that "Nordstrom fails to provide the average amount of time worked each day in order to properly calculate the waiting time penalties,"[75] Nordstrom cured this omission in its opposition.   It proffered supplemental declarations by Martin and Walsh stating that, on average, putative class members worked approximately eight hours per day.[76]   This evidence provides substantial support for Nordstrom's estimate that class members worked five hours per day for purposes of calculating waiting time penalties.   The court therefore finds that Nordstrom's calculation of waiting time penalties is neither speculative nor unsupported.

Nordstrom also adduces credible evidence indicating that 114 of the 283 putative class members who separated during the class period were paid an average hourly rate of $10.33 per hour, while the remaining 169 were paid an average hourly rate of $16.99 per hour.[77]   To calculate the amount of waiting time penalties placed at issue by Carranza's complaint for each class member, the court multiplies the class member's average hourly rate of pay by five hours,

---

[74]Removal at 13.

[75]Motion at 8.

[76]See Walsh Supp. Decl., ¶ 7 ("Based on the combined daily hourly time data for Distribution Center Employees and Hautelook Nordstrom Employees described above, I confirmed the average daily hours worked by all Distribution Center Employees and Hautelook Nordstrom Employees to be 7.995 hours"); Declaration of Kristen Martin in Opposition to Motion to Remand ("Martin Supp. Decl."), Docket No. 17 (Nov. 24, 2014), ¶ 4 ("Based on the daily time data described above, I determined the average daily hours worked by the non-exempt, hourly Hautelook employees employed at the Hautelook Fulfillment Center from July 26, 2012, through December 21, 2013, who were also included in the data set I reviewed for my first declaration to be 8.712 hours").

[77]Walsh Removal Decl., ¶¶ 7-8; Martin Removal Decl., ¶¶ 6, 8.

and multiplies the resulting number by thirty days.  Using this formula, potential damages on the waiting time penalties claim are $607,339.50.[78]

### (4)   Inaccurate Wage Statements

California Labor Code § 226(a) provides that

"[e]very employer shall, semimonthly or at the time of each payment of wages, furnish each of his or her employees . . . an accurate itemized statement in writing showing (1) gross wages earned; (2) total hours worked by the employee . . . (3) the number of piece-rate units earned and any applicable piece rate if the employee is paid on a piece-rate basis, (4) all deductions, provided that all deductions made on written orders of the employee may be aggregated and shown as one item, (5) net wages earned, (6) the inclusive dates of the period for which the employee is paid, (7) the name of the employee and only the last four digits of his or her social security number or an employee identification number other than a social security number, (8) the name and address of the legal entity that is the employer . . . , and (9) all applicable hourly rates in effect during the pay period and the corresponding number of hours worked at each hourly rate by the employee."  CAL. LAB. CODE § 226(a).

Section 226(e) provides that "[a]n employee suffering injury as a result of a knowing and intentional failure by an employer to comply with subdivision (a) is entitled to recover the greater of all actual damages or fifty dollars ($50) for the initial pay period in which a violation occurs and one hundred dollars ($100) per employee for each violation in a subsequent pay period, not exceeding an aggregate penalty of four thousand dollars ($4,000)."  *Id.*, § 226(e).

In calculating a potential class recovery of $1,081,000 on the inaccurate wage statement claim, Nordstrom assumed that each of the 232 putative class members received an inaccurate wage statement for each of 10,494 pay periods during the year preceding filing of the complaint.[79]

---

[78]((5x $16.99) x 30) x 169 + ((5x $10.33) x 30) x 114.

[79]Removal at 14.

Nordstrom asserts that it used a penalty of $50 for the first violation and $100 for each violation thereafter.[80]   It does not explain its calculation further.   Based on the information provided, it appears that Nordstrom assumed 232 $50 penalties, and 10,262 subsequent $100 penalties.   This amounts only to $1,037,800.[81]

As an initial matter, the court notes that Nordstrom's estimate of 10,494 pay periods during the limitations period, i.e., the one year preceding Carranza's filing of the complaint, is inaccurate.   Although Nordstrom does not explain in its notice of removal or in its opposition to Carranza's motion how it arrived at this figure, it appears to be the sum of the number of pay periods worked by Hautelook Fulfillment Center employees between July 15, 2013 and the end of December 2013 reported in Martin's declaration[82] – 1,608 pay periods – and the number of pay periods worked by employees at Nordstrom's other distribution centers between July 15, 2013 and August 2, 2014, as set forth in Walsh's declaration[83] – 8,886 pay periods.   The court's calculations confirm the accuracy of Martin's statement.   She notes that the Hautelook Fulfillment Center paid employees every other week during 2013, which resulted in 26 pay periods per year.[84] From July 15, 2013 until the end of December 2013, there were thus 12 pay periods per employee.   Given the fact that 134 putative class members were employed at the Hautelook facility during this time period, this equals a total of 1,608 pay periods between July 15, 2013 and the end of December 2013.[85]   Beginning on December 22, 2013, Hautelook Fulfillment Center employees became employees of Nordstrom.[86]   As a result, they were no longer paid once every other week;

---

[80]*Id.*

[81](232 x $50 = $11,600) + (10,262 x $100 = $1,026,200).

[82]See Martin Removal Decl., ¶ 9.

[83]See Walsh Removal Decl., ¶ 5.

[84]Martin Removal Decl., ¶ 9.

[85]*Id.*, ¶¶ 4, 9.

[86]See Walsh Supp. Decl., ¶ 3.

rather, they were paid twice monthly, like all Nordstrom employees.[87] Thus, from January to July 15, 2014, Hautelook employees worked 13 pay periods.[88] Each Nordstrom employee thereafter worked two pay periods between the filing of the complaint and the removal of the action to this court. Thus, for the period between December 22, 2013 and August 2, 2014, Hautelook Fulfillment Center employees worked 15 pay periods each, or a total of 2,010 pay periods;[89] these pay periods were not reflected in Nordstrom's initial calculation of the amount in controversy. If these periods are added to the 1,608 pay periods calculated by Martin, Hautelook Fulfillment Center employees, worked 3,618 pay periods during the statutory period.

Walsh's calculation of 8,886 pay periods for putative class members employed at Nordstrom's other distribution centers during the limitations period appears to be significantly overstated. Walsh reports that 98 putative class members were employed at Nordstrom's fulfillment centers during the statutory period and were paid twice monthly. This would mean there were 24 pay periods per employee each year.[90] Thus, the total number of pay periods during the year preceding the filing of the complaint is the product of those two numbers – 2,352 pay periods. Adding in two additional pay periods per employee for the time between the filing of the complaint and Nordstrom's removal to this court, the total number of pay periods would be 2,548.[91]

The sum of the Hautelook employees' pay periods and Nordstrom distribution center employees' pay periods is 6,166, far below Nordstrom's estimate of 10,494 pay periods. Because it is based on 10,494 pay periods during the year preceding the filing of the action, Nordstrom's calculation of the amount in controversy on the inaccurate wage statement claim is overstated.

---

[87]See Walsh Removal Decl., ¶ 5.

[88]Calculated as two pay periods each for the months of January, February, March, April, May, and June 2014, and one pay period for the month of July 2014.

[89]15 pay periods x 134 employees = 2,010 total pay periods

[90]Walsh Removal Decl., ¶¶ 5-6.

[91]2,352 + (2 x 98) = 2,548.

Carranza does not dispute Nordstrom's assumption that class members received inaccurate wage statements for each pay period during the year-long limitations period.  Rather, he takes issue with Nordstrom's assertion that every pay period except the class member's first pay period during the year was a "subsequent" pay period for purposes of calculating penalties under § 226.[92] Carranza notes that, under California law, an employer must be notified that it is violating a Labor Code provision before its violations can be penalized at the "subsequent violation" rate.[93]  As support for this contention, Carranza cites the California Court of Appeal's opinion in *Amaral v. Cintas Corp. No. 2*, 163 Cal.App.4th 1157 (2008).  There, the court considered the meaning of "initial" and "subsequent" violations as used in the penalty provisions of Labor Code §§ 210 and 225.5.  *Amaral*, 163 Cal.App.4th at 1209.  The court concluded that, under §§ 210 and 225.5, an employer may only be subject to the higher statutory penalty for "subsequent" violations after it has been given notice that its practices violate the California Labor Code.  *Id.*  It explained:

> "Upon consideration of the statutory language, we agree with the interpretation the DLSE has used to enforce sections 210 and 225.5.  The statutes state that a penalty for an initial violation is to be imposed 'for each failure to pay each employee.'  (§§ 210, subd. (a), 225, subd. (a).)  This language conveys two things.  First, by specifying a $50 penalty must be imposed 'for each failure to pay each employee' (italics added), the language contemplates that an 'initial violation' can result in more than one penalty at the $50 level.  In other words, multiple $50 penalties can result from a single initial violation.  The only way this could conceivably occur is if penalties are assessed at each pay period.  The DLSE's interpretation on this point is consistent with the statutory language: Each time an employer fails to pay its employee in accordance with the specified Labor Code provision, a penalty will result.  Second, because the statutory language contemplates the imposition of repeated penalties for each pay period that an initial violation continues, a

---

[92]Motion at 6-7.

[93]*Id.* at 6.

'subsequent' violation (which carries a double penalty) must refer to something other than an underpayment that occurs after the first pay period.   Although common sense might suggest a 'subsequent' violation is nothing more than a violation that occurs at a later point in time after an 'initial' violation, this definition is inadequate because the statutes provide for multiple penalties for 'each failure to pay each employee' incurred in an initial violation.   (§§ 210, subd. (a), 225.5, subd. (a).)   If the difference is not merely temporal, how is one to tell what constitutes a subsequent as opposed to an initial violation?   The statutes do not explain, but we find the DLSE's reliance on notice persuasive.   Until the employer has been notified that it is violating a Labor Code provision (whether or not the Commissioner or court chooses to impose penalties), the employer cannot be presumed to be aware that its continuing underpayment of employees is a 'violation' subject to penalties.   However, after the employer has learned its conduct violates the Labor Code, the employer is on notice that any future violations will be punished just the same as violations that are willful or intentional – i.e., they will be punished at twice the rate of penalties that could have been imposed or that were imposed for the initial violation." *Id.*

The court is not persuaded that *Amaral*'s analysis of penalties under §§ 210 and 225.5 applies to penalties recoverable under § 226. As noted, the *Amaral* court addressed the meaning of "initial" and "subsequent" violations only as those terms are used in Labor Code §§ 210 and 225.5. *Id.* Elsewhere in the opinion, the court explicitly addressed § 226 and noted that penalties under § 226(e) – be they initial or subsequent – are available only upon a showing that the employer "knowing[ly] and intentional[ly]" failed to provide accurate itemized wage statements. The court contrasted this with §§ 210 and 225.5. These statutes, which provide for statutory penalties, do not have a general "knowing and intentional" requirement for recovery of penalties; rather, they require a showing of willfulness only to recover higher statutory penalties for subsequent violations. See *id.* at 1195 ("When proven, Labor Code violations give rise to civil penalties. Some statutory penalties are imposed only if an employers' violation was 'willful' or

'knowing.'  Relevant to the claims here, section 203 penalizes an employer that 'willfully' fails to pay wages due under sections 201 or 202, and section 226, subdivision (e) penalizes an employer's 'knowing and intentional' failure to provide itemized wage statements under section 226, subdivision (a) (see also § 226.3 [providing civil penalties for violation of section 226, subdivision (a) but directing Labor Commissioner to consider whether violation was inadvertent]). Two other penalty statutes impose penalties regardless of the employer's mental state but provide for higher penalties if the violation is 'willful or intentional.'  (Former §§ 210, as amended by Stats. 1983, ch. 1096, § 1, p. 4103 [penalties for violation of section 204], 225.5, as amended by Stats. 1983, ch. 1096, § 2, p. 4103 [penalties for violation of section 223])").

The distinctions between the statutes noted by the *Amaral* court indicate that its holding concerning the showing that must be made to recover higher penalties under §§ 210 and 225.5 does not apply to § 226.  The reference to "willful and intentional" conduct in §§ 210 and 225.5 is found in the penalty provision governing "subsequent" violations; the same language in § 226 applies to all violations – both initial and subsequent.  See CAL. LAB. CODE § 210(a)(2) ("For each subsequent violation, or *any willful or intentional violation*, two hundred dollars ($200) for each failure to pay each employee, plus 25 percent of the amount unlawfully withheld"); *id.*, § 225.5 (same); *id.*, § 226(e) ("An employee suffering injury as a result of *a knowing and intentional failure* by an employer to comply with subdivision (a) is entitled to recover the greater of all actual damages or fifty dollars ($50) for the initial pay period in which a violation occurs and one hundred dollars ($100) per employee for each violation in a subsequent pay period. . .").  The structure of §§ 210 and 225.5 supports the *Amaral* court's holding that an employer must be aware that its conduct is violating one of those sections before it can be subjected to the $200 penalty. In contrast, § 226 requires a showing of a willful or intentional violation to recover *any* penalty. In calculating the amount in controversy on Carranza's inaccurate wage statement claim, therefore, so long as he pleads facts demonstrating that Nordstrom's violations of § 226 were

"knowing and intentional," Nordstrom can assume a $50 penalty for the first pay period violation per class member and a $100 penalty for each subsequent pay period violation.[94]

The court therefore turns to the meaning of "knowing and intentional" as used in § 226(e). An employer "knowing[ly] and intentional[ly]" fails to comply with § 226 if it knew the facts giving rise to the statutory violation; the employer need not know that its conduct was unlawful.

---

[94]The court is aware that at least two courts have viewed the matter differently and concluded that *Amaral*'s holding applies to penalties under § 226. See *Perez v. WinnCompanies, Inc.*, No. 1:14-CV-01497 LJO-JLT, 2014 WL 5823064, *7 (E.D. Cal. Nov. 10, 2014) ("Defendants expect Plaintiff will request $50 for the initial violation and $100 for each subsequent violation. '[S]ince Plaintiff was paid on a biweekly basis' and the claim is subject to a one-year statute of limitations, Defendants calculate that the amount in controversy includes 26 pay periods and a total of $2,550.00.' Importantly, the word 'subsequent' has a specific meaning under the California Labor Code. 'Until the employer has been notified that it is violating a Labor Code provision . . . the employer cannot be presumed to be aware that its continuing underpayment of employees is a 'violation' subject to penalties.' *Amaral v. Cintas Corp. No. 2*, 163 Cal.App.4th 1157, 1209 (2008). 'However, after the employer has learned its conduct violates the Labor Code, the employer is on notice that any future violations will be punished just the same as violations that are willful or intentional – i.e., they will be punished at twice the rate of penalties that could have been imposed or that were imposed for the initial violation.' *Id.* Defendants' calculations are based upon the assumption that Plaintiff is entitled to the enhanced rate for 'subsequent' violations for 25 of the 26 pay periods. However, Plaintiff does not assert that Defendants were notified any Labor Code violations prior to the filing of this lawsuit. Consequently, the Court cannot presume that Defendants were aware of the violations subject to the enhanced penalties"); *Patel v. Nike Retail Services, Inc.*, __ F.Supp.2d __, 2014 WL 3611096, *8 (N.D. Cal. July 21, 2014) ("Plaintiff alleges that Defendant failed to provide accurate itemized wage statements in violation of section 226 of the California Labor Code. Plaintiff states in her complaint that she may elect to recover $50 for the initial pay period in which the violation occurred, and $100 for each 'subsequent' violation. She also alleges that Defendant committed ten different statutory violations to which PAGA penalties apply. As to those violations, enhanced penalties for 'subsequent' violations are also available, although Plaintiff does not specifically state in her complaint that she is seeking them. The word 'subsequent' has a specific meaning under the California Labor Code. 'Until the employer has been notified that it is violating a Labor Code provision . . . the employer cannot be presumed to be aware that its continuing underpayment of employees is a 'violation' subject to penalties.' 'However, after the employer has learned its conduct violates the Labor Code, the employer is on notice that any future violations will be punished just the same as violations that are willful or intentional – i.e., they will be punished at twice the rate of penalties that could have been imposed or that were imposed for the initial violation'" (citations omitted)). The court respectfully disagrees with the *Perez* and *Patel* courts' reading of *Amaral* for the reasons stated in text.

See *Willner v. Manpower, Inc.*, __ F.Supp.2d __, 2014 WL 1303495, *11 (N.D. Cal. Mar. 31, 2014) ("[T]he Court concludes that a 'knowing and intentional' violation requires a showing that the defendant knew that facts existed that brought its actions or omissions within the provisions of section 226(a) – i.e., that Manpower knew that its wage statements did not contain the inclusive dates of the period for which its employees were paid, and knew that they did not contain Manpower's address. Willner is not required to demonstrate that Manpower knew that this conduct, if otherwise proven, was unlawful"); *Perez v. Safety-Kleen Sys., Inc.*, No. 07-CV-0886 PJH, 2007 WL 1848037, *9 (N.D. Cal. June 27, 2007) (holding that the fact that defendant did not know the illegality of its deficient wage statements was irrelevant in determining whether the knowing and intentional element is satisfied because all that is required to satisfy that element is knowledge that the defendant "knowingly and intentionally provide[d] wage statements containing the incorrect total hours worked").

Read in context, Carranza's allegations plead that Nordstrom acted "knowingly and intentionally" because it provided wage statements to putative class members that did not accurately reflect all hours worked. Consequently, based on the evidence the parties have adduced, the court concludes that Nordstrom was entitled to assume, for purposes of estimating the amount in controversy, that it would be subject to a $100 penalty for all but the first pay period an employee received such a wage statement. Despite this fact, Nordstrom's estimate of potential class damages is overstated because it uses 10,494 pay periods in a one-year period to calculate the potential class recovery. Calculating class damages on the § 226 claim using the 6,166 pay periods calculated by the court, it concludes that $605,000 is in controversy on the § 226 claim.[95]

### (5)   PAGA Penalties and Attorneys' Fees

Finally, Nordstrom estimates that Carranza's complaint places PAGA penalties of $1,049,400 and attorneys' fees of at least $350,000 at issue.[96] Given its determinations with

---

[95](232 x $50) + (5,934 x $100) = ($11,600) + ($593,400) = $605,000

[96]Removal at 14-15; Opposition at 15-17.

respect to Nordstrom's showing concerning damages on Carranza's other claims, the amount in controversy would fall far short of the jurisdictional minimum even if the court credited Nordstrom's PAGA and attorneys' fees calculations.   The court has found that Nordstrom established, by a preponderance of the evidence, that there is between $1,507,455.10[97] and $2,233,893.50[98] in controversy on Carranza's unpaid wages, overtime, meal period and rest break, waiting time penalties and inaccurate wage statement claims.   Thus, even if Nordstrom's estimate of PAGA penalties and attorneys' fees is accepted, Nordstrom's evidence supports *at most* an amount in controversy of $3,633,293.50, below the jurisdictional minimum.   The court therefore need not consider whether Nordstrom's estimate of PAGA penalties and attorneys' fees is supported by summary-judgment type evidence.[99]

---

[97]$113,506 + $181,609.60 + $607,339.50 + $605,000 = $1,507,455.10

[98]$113,506 + $908,048.00 + $607,339.50 + $605,000 = $2,233,893.50

[99]The parties dispute whether PAGA penalties can be included in the amount in controversy in assessing jurisdiction under CAFA based on the Ninth Circuit's recent decision in *Baumann v. Chase Inv. Servs. Corp.*, 747 F.3d 1117, 1124 (9th Cir. 2014).   There, the court held that "PAGA is not sufficiently similar to Rule 23 to establish the original jurisdiction of a federal court under CAFA."   (Motion at 5-6.)   See also *id.* at 1122 ("we conclude that PAGA actions are also not sufficiently similar to Rule 23 class actions to trigger CAFA jurisdiction").   Nordstrom contends that despite this holding, *Baumann* does not stand for the proposition that PAGA claims cannot be included in the amount in controversy calculation when they are pled as class claims. (Opposition at 15.)

Since the Ninth Circuit's decision in *Baumann*, no court has directly addressed whether PAGA penalties can be included in the amount in controversy when defendant seeks to remove a class action complaint that pleads a PAGA claim.   Courts that have considered removals under CAFA, however, have implicitly addressed the question and reached conflicting conclusions. Compare *Hughes v. McDonald's Corp.*, No. C 14-17001 PJH, 2014 WL 3797488, *8-9 (N.D. Cal. July 31, 2014) (remanding an action to state court after concluding that the amount in controversy, including damages on class claims for violations of the California Labor Code and PAGA penalties, did not exceed $5,000,000); *Ford v. CEC Entertainment, Inc.*, No. CV 14-01420 RS, 2014 WL 3377990, *6 (N.D. Cal. July 10, 2014) (concluding that CAFA's amount in controversy requirement was satisfied after including PAGA penalties in the calculation of total class damages) with *Sanchez v. Capital Contractors, Inc.*, No. C 14-2622 MMC, 2014 WL 4773961, *1-3 (N.D. Cal. Sept. 22, 2014) (discharging an order to show cause why a case should not be remanded for lack of subject matter jurisdiction under CAFA because defendant's initial calculation of the amount in controversy was based on PAGA penalties, and finding that the

amount in controversy, not including PAGA penalties, exceeded $5,000,000). The court need not reach the issue, because Nordstrom has not shown that the jurisdictional amount is satisfied even if its estimated PAGA penalties are included.

There is another issue regarding Nordstrom's estimate of PAGA penalties. Nordstrom assumes that 100 percent of potential PAGA penalties are properly included in the amount in controversy. This assumption is inconsistent with the decisions of several courts that have concluded that only 25 percent of potential PAGA penalties can be included in the amount in controversy. See CAL. LAB. CODE § 2699(i) ("[C]ivil penalties recovered by aggrieved employees shall be distributed as follows: 75 percent to the Labor and Workforce Development Agency for enforcement of labor laws and education of employers and employees about their rights and responsibilities under this code, to be continuously appropriated to supplement and not supplant the funding to the agency for those purposes; and 25 percent to the aggrieved employees"); see also, e.g., *Smith*, 2010 WL 1838726 at *2, 5 (including only 25% of the total recovery possible under PAGA in calculating the amount in controversy); *Pulera v. F & B, Inc.*, No. 2:08-cv-00275 MCE DAD, 2008 WL 3863489, *4 (E.D. Cal. Aug. 19, 2008) ("The amounts recoverable by Plaintiff based on her PAGA claims are separate and distinct from the amounts recoverable by the State of California via the LWDA, and therefore these amounts may not be aggregated").

As respects its attorneys' fees calculation, Nordstrom maintains that its estimate is conservative because its constitutes only six percent of the class' estimated recovery when an award of 25 percent is "common . . . in class cases." (Opposition at 16.) The problem with this aspect of Nordstrom's calculation is that it is based on its view of potential amounts recoverable on Carranza's other claims. As noted throughout this order, Nordstrom's calculations of those amounts are based on unsupported assumptions and thus overstated.

Additionally, Nordstrom's calculation of attorneys' fees appears to take into account all fees that will be incurred during the course of the litigation. Nordstrom does not proffer any evidence that Carranza (or it) has incurred $350,000 in attorneys' fees since the filing of the complaint. Carranza argues that the court should not credit Nordstrom's fee estimate because only fees that have accrued as of the time of removal can be included in calculation of the amount in controversy, and it adduces no evidence of fees as of August 15, 2014. (Reply at 5-7.)

Courts in the Ninth Circuit are split as to whether only attorneys' fees that have accrued at the time of removal should be considered in calculating the amount in controversy, or whether the calculation should take into account fees likely to accrue over the life of the case. Compare *Brady v. Mercedes-Benz USA, Inc.*, 243 F.Supp.2d 1004, 1011 n. 4 (N.D. Cal. 2002) ("While an estimate of the amount in controversy must be made based on facts known at the time of removal, that does not imply that items such as future income loss, damages, or attorneys['] fees likely to be incurred cannot be estimated at the time of removal"); *Simmons v. PCR Technology*, 209 F.Supp.2d 1029, 1034-35 (N.D. Cal. 2002) ("Such fees necessarily accrue until the action is resolved. Thus, the Ninth Circuit must have anticipated that district courts would project fees beyond removal") with *Dukes v. Twin City Fire Ins. Co.*, No. CV 09-2197 PHX-NVM, 2010 WL 94109, *2 (D. Ariz. Jan. 6, 2010) ("This Court concludes that the better view is that attorneys' fees incurred after the date of removal are not properly included in because the amount in controversy is to be determined as of the date of removal. Future attorneys' fees are entirely

### (6)   Conclusion Regarding Amount in Controversy

For the reasons stated, the court concludes that Nordstrom has failed to adduce sufficient evidence to demonstrate by a preponderance of the evidence that the amount in controversy exceeds $5,000,000, as required by CAFA.   Accordingly, the court lacks subject matter jurisdiction to hear this action and grants Carranza's motion to remand.

---

speculative, may be avoided, and are therefore not 'in controversy' at the time of removal"); *Green v. Party City Corp.*, No. CV 01-09681 CAS (Ex), 2002 WL 553219, *2 & n. 3 (C.D. Cal. Apr. 9, 2002) (calculating attorneys' fees on the basis "only [of] work done by plaintiff's counsel prior to removal"); *Faulkner v. Astro-Med, Inc.*, No. C 99-2562 SI, 1999 WL 820198, *4 (N.D. Cal. Oct. 4, 1999) ("When estimating attorney's fees for the purposes of establishing jurisdiction, the only fees that can be considered are those incurred as of the date of removal," citing *Miranti v. Lee*, 3 F.3d 925, 928 (5th Cir. 1993)); *Conrad Associates v. Hartford Acc. & Indem. Co.*, 994 F.Supp. 1196, 1200 (declining to consider post-removal events in calculating attorneys' fees for purposes of assessing removal jurisdiction).   See also *Giordano v. Park Avenue Life Insurance Co.*, No. CV 09-01405 SJO (FMOx), 2009 WL 1474945, *3 (C.D. Cal. Apr. 7, 2009) ("Where attorneys' fees are to be included in the amount in controversy, 'district courts in this circuit have disagreed [as to] whether attorneys' fees incurred after the date of removal are properly included in the amount in controversy:' some courts refuse to consider attorneys' fees incurred after removal whereas others include a 'reasonable estimate of attorneys['] fees likely to be expended,'" quoting *Burk v. Medical Savings Insurance Co.* 348 F.Supp.2d 1063, 1068-69 (D. Ariz. 2004) (alterations original)); *Wastier v. Schwan's Consumer Brands*, No. 07CV1594, 2007 WL 4277552, *3 (S.D. Cal. Dec. 5, 2007) ("Defendants' estimate of [p]laintiffs' fees for activities anticipated but not yet performed, even if accurate, may be irrelevant").

The court agrees with Carranza and those courts that have held that only attorneys' fees that have accrued as of the date of removal may be considered in determining whether the jurisdictional amount is at stake.   Thus, even if the court were to credit the remainder of Nordstrom's unsupported assumptions, it would find Nordstrom's estimate of attorneys' fees speculative inasmuch as it is not supported by summary-judgment type evidence concerning the fees incurred as of the date of removal.

**III.  CONCLUSION**

For the reasons stated, the court grants Carranza's motion to remand the action to San Bernardino Superior Court, and directs the clerk to remand the action forthwith.

DATED: December 12, 2014

_____
MARGARET M. MORROW
UNITED STATES DISTRICT JUDGE